ARBITRATION

Bachman's Sunny Hill Farm,

Claimant                                                    2017 MPCI Policy 39-987-742500

Vs.                                                         Arbitrator Scott S. Brinkmeyer

Producer's Agriculture Insurance Company,

Respondent

**AWARD of ARBITRATION**

A hearing in the above matter was commenced on February 4, 2020, in Grand Rapids, Michigan, and completed on February 5, 2020. Appearing for the Claimant was John Tallman, Esq. Appearing for the Respondent was Daniel N. Rosenstein, Esq. The arbitration was conducted, and this award is issued, pursuant to the Commercial Rules of the American Arbitration Association ("AAA"), and section 20 of the Common Crop Insurance Policy ("Basic Provisions") reinsured by the Federal Crop Insurance Corporation ("FCIC"), under the Federal Crop Insurance Act (7 USC 1501 *et seq*.).

**I. Factual Findings**

Claimant Bachman's Sunny Hills Farms ("Bachman," or "Claimant.") is a corporation located in Ohio and is engaged in the business of growing and packing apples. Respondent Producer's Agriculture Insurance Company ("Respondent," or "Pro Ag.") is an Authorized Insurance Provider ("AIP") for the FCIC and sells and services insurance policies drafted and reinsured by the FCIC. Pro Ag issued a Multi-peril Crop Insurance Policy covering Claimant's apple crop in Fairfield County Ohio, for the 2017 crop year. The coverage sold to Claimant included Apple Crop Insurance Provisions (ACIP"), and a Fresh Fruit Quality Endorsement ("FFQE"), otherwise known as a fresh fruit option (Hearing testimony of Gregg Bachman, 2/04/2020, p. 95.), which guarantees indemnity for certain covered losses based on quality, provided they comply with the criteria contained in the Basic Provisions and the ACIP.

The FCIC develops and publishes various procedures for administering the insurance sold by AIP's, among which are the Loss Adjustment Standards Handbook ("LASH") and the Loss Adjustment Manual Standards Handbook ("LAM"). The management arm of the FCIC, i.e., the Risk Management Agency ("RMA"), interprets the policies and procedures, and in the course of doing so issues Final Agency Determinations ("FAD"), bulletins and other publications, all of which are found on their website. AIP's, their employees and all insureds are bound by the RMA FAD's and the terms of the CCIP's, which cannot

1

be waived or varied in any way unless authorized by the policy or agreed to by FCIC. The preamble to the CCIP indicates that these procedures will be used in the administration of the policy, including the adjustment of any loss or claim. (Claimant's ["C"] Exhibit 1; p. 1)

Pursuant to the Fresh Fruit Quality Adjustment of the ACIP, any fresh apple production sold as U.S. Fancy or better must be included as production to count. (Apple Crop Insurance Provisions, Section 14. (5) (v.); @ C-2, p. 5.) When a FFQE is purchased (See e.g., C-5, pp. 1-4), it includes a "guarantee," which applies when an insured experiences damages to crops and a subsequent appraisal shows that the damage exceeds 20%. (LASH, C-4, p. 56.) The appraiser fills out an Apple Appraisal Worksheet form ("AAW") containing estimates of the % of actual damage. (C-6, Box 40, Bates PA 0140-0142.)

Respondent's expert and RMA employee Desiree King provided further clarification of the fresh fruit option and the adjusting process. She testified that section 12 of the ACIP pertains to apples insured as US number one, whereas section 14 covers apples insured as US Fancy or better. Each policy provision has alternative adjustment procedures. Section 14 (b)(5) (i)-(iv) of the ACIP has a scale that is applied pertaining to production to count, which is the apple production meeting US Fancy and which the insured does not get paid on. The scale is applied when more than 20% of a crop does not grade to US Fancy or better. If a crop has damage within a given block of apples, the guarantee under the policy pays for damage to those apples on an escalating scale as the % damage increases. The base policy pays for any apple that is not US processing number one grade or better, and the fresh fruit option pays for any apple that is not US Fancy or better. (D. King hearing testimony, 2/05/2020, pp. 10-18.)

She pointed out that, if the crop is harvested then adjusters must use the farmer's records of the disposition of that production to assure that all apples sold as US Fancy or better are included in production to count. These procedures are further clarified in the LASH, which essentially repeats the requirements in the ACIP; i.e., once a farmer harvests the crop, a claim cannot be finalized until all of the apples are sold or otherwise disposed of. She confirmed that the applicable ACIP was issued in 2010, and anyone having purchased a fresh fruit option since then would be subject to those provisions. (*Id.*)

In 2017, Bachman's incurred hail damage to its apple crops and submitted a claim to Pro Ag on July 13, 2017. The claim form was submitted by Scott Colville, Respondent's named expert and a longstanding insurance agent for Bachman and a Pro Ag approved agent. (Respondent's ["R"] Exhibit 10) This was the first such claim of any kind Bachman had experienced since they had a total loss claim from frost around 2009-10, if not before. (Gregg Bachman Deposition, 11/12/2019; pp. 11-13.) It was Bachman's policy to always pick their apples because there is at least a salvage value for the picked apples

and they would not leave them "on the floor of the orchard." Consequently, regardless of their condition, their apples would always come off the trees. (*Id.*, pp. 17-18.)

On July 25, an adjuster for Pro Ag, Dustin Converse, started an appraisal of the loss, as required under the policy. There were three insured "blocks," of damaged apple trees, which Gregg Bachman first toured with Mr. Converse, who then proceeded back to the blocks alone to perform an inspection of the affected crops. (Hearing testimony of Dustin Converse; 2/04/2020, p. 141-44; see also R- 11)   During his inspection, he counted the apples from sample trees, took actual samples for analysis, and began filling out AAW's for the blocks. (*Id*.). Among other things, he made preliminary assessments of the percentage of damage to the crops in each block. He later returned to the Bachman shop area to discuss his findings with Mr. Bachman. When they met and Converse showed Bachman the Worksheets, a conversation ensued which is a key element of Bachman's claim.

When first shown the worksheets, Gregg Bachman looked at some of the numbers at the bottom, in box "40 and Meeting Grade 39." and he "told Dustin that those weren't right…," and that he didn't agree with the damage appraisals. (Bachman hearing testimony, p. 98; see also Bachman dep., p. 21, lines 18-24; and see Claimant's Arbitration Brief, Exhibit H.) When asked why he signed the Worksheets if he didn't agree with the appraisal, Bachman said that Converse "told [him] that these numbers didn't mean anything, they were going to use [his] pack out records." He testified that Converse "implied" that his signing the AAW's was just to show that Converse had been there. (*Id*., p. 22; lines 8-18; see also, hearing testimony 2/04/2020, pp. 98-99).  He "inferred" he had to pack out because Converse told him he was going to use his pack out records to compute the claim. (*Id*., p. 100) , and his conclusion that he had to pack out was based totally on Dustin's comment that he was going to adjust the claim based on the pack out records. (G. Bachman deposition, p. 75) Gregg's nephew and employee, Jordan Bachman, stood close by and observed the discussion. He generally supported Gregg's description of the conversation. (Jordan Bachman hearing testimony, 02/04/2020, pp. 129-30.)

Dustin Converse testified that he was unable to complete the appraisal on July 25, because Claimant had not harvested and so he did not have a final production number. He reviewed the AAW's with Bachman, explained that they would be coming back later on to complete the appraisals, but Gregg had questions about final numbers he couldn't answer because he didn't have final production figures. (Converse hearing testimony, pp. 142-50.) He ran some rough numbers for Bachman and explained how the sliding scale chart worked for the indemnity adjustment under the FFQE. After that he felt that Bachman was satisfied with the explanation, Gregg signed the AAW's, and he told Converse they were going to begin picking the apples in the next couple of weeks. (*Id*. pp. 150-51; and see C-6, pp. 1-3.)

3

Bachman testified to the contrary in his deposition and said that he didn't understand the forms and no one explained to him what each of the entries referred to. (Bachman dep., pp.20-21.)

Converse made two follow up trips to the Sunny Hill farm to complete the appraisals, the first on August 28, 2017, during which he was accompanied by his supervisor, Karen Landman. She went along in order to answer questions about insurance policy options available for hail damage, but she did help with the appraisal process. (Karen Landman hearing testimony, 2/04/2020, pp. 227-28.) It wasn't until the last visit on or about September 18, that Converse was able to complete the AAW's and apply the quality factors to the % of damaged crops. It was also the first time that he was able to determine what the production to count would be based upon the appraisals. (Converse hearing testimony, pp. 152-55.) He ultimately estimated that the percentage of damages in the three blocks were 52%, 56% and 26%, respectively. (C-6, Box 40, *supra,* pp. 1-3..)

In the meantime, Bachman had begun harvesting (I.e., picking), their apples, a process which typically extended into October. (G. Bachman dep., p. 26.) They then packed out and sold their apples during the remainder of 2017, and continuing into March or April of the following year. (*Id*.) The pack out process includes washing, waxing, sorting, grading and packaging the apples for sale. It's a process used specifically for apples to be sold as grade U.S. Fancy or better. (*Id*., pp. 39-40.)  In a normal year, every Sunny Hills apple goes through their packing line, but in 2017, their McIntosh variety crop was too poor to pack, so those were separated and sold for juice. All other varieties went across the packing line. (*Id*., pp. 41-42.) Eventually, Sunny Hill Farms sold 24,022 bushels of apples as U.S. Fancy grade from the so-called "Home Farm," i.e., block B. (G. Bachman deposition, pp. 66, 69; G. Bachman hearing testimony, pp. 116-17; and see R-18, SO # 17021, blue marked totals)

Following the September meeting at Bachman's office to finalize the adjustment, there were no further contacts between Pro Ag and Claimant until June of 2018, with the exception of subsequent calls from Dustin Converse to check on the status of the pack out process. (G. Bachman dep., pp. 25-26.) Sunny Hill completed apple sales in late April 2018, Converse prepared a Production Worksheet Summary, which Gregg Bachman signed on June 15, the claim was finalized that month and Bachman was paid $33,772.00 (R-18, Ship columns, pp.5-6; R-14 p.4; Hearing testimony of Scott Colville, p. 37; Hearing testimony of G. Bachman, p. 106; C-8, "Scenario 1 –Packing out/ Indemnity.")

After he assisted Bachman with filing the initial claim on July 13, 2017, Mr. Colville said did not learn anything more about the claim until late summer or fall of 2018, when he happened stop by at Sunny Hill Farm. (S. Colville hearing testimony, Id., p. 37.) According to Gregg Bachman, the first time they communicated about Claimant's issues with the claim adjustment was in November of 2018, when Colville

came to renew his policy. (G. Bachman deposition, p. 34.) In any event, after he spoke with Bachman, Colville contacted Karen Landman and they exchanged e-mails discussing the claim in early November. (R-21, pp. 1-4.) Colville explained that his client had two issues. First, he said that Bachman "did not know his options concerning his 2017 crop, [and] … was under the impression (**probably a miscommunication**) that he had to harvest and pack out all of his apples before he would receive any payment." He also said that "Gregg feels a lot of the hail damage was missed." (Id., pp.2-3; emphasis added.)

Landman responded that "adjusters do explain to the grower that [Pro Ag] cannot finalize the claim until all harvested apples are sold or sent to cider. [Pro Ag] needs US Fancy sold figures and must wait for final distribution of all apples in the unit prior to finalizing the claim according to the Apple Provisions." (*Id*.)  Colville replied that "Gregg claims [the words] 'or sent to cider' [were] never given to him as an option," and reiterated Bachman's position that otherwise he would not have packed out and would have sold for cider. (*Id*., p. 1)

In the summer of 2019, Claimant exercised his arbitration right under the Basic Provisions, and a Statement of Claim was filed on August 7, alleging that Dustin Converse had improperly "**instructed**" Bachman that he "was **required** to 'pack out' the hail-damaged apple crop prior to the claim adjustment being finalized…," and that [Pro Ag] "was prohibited from instructing Claimant to pack out …' under provisions of the LASH and the LAM. (Claimant's Statement of Claim, 8/07/2019, p. 2, paras. 5, 11; emphasis added.) Although breach of contract was not initially alleged, it was later argued that directing Bachman to pack out breached the insurance contract. (Claimant's Arbitration Brief, December 6, 2019, p. 1, 4.)

## II. Issues and Determination.

Throughout this arbitration proceeding Claimant has raised a number of issues, which include:

(1) Are the LASH and/or the LAM part of the insurance contract terms;

(2) Whether Pro Ag, acting through Dustin Converse, directed Bachman to harvest his apple crop;

(3) If so, did that constitute a breach of the insurance contract terms;

(4) Whether Pro Ag, acting through Dustin Converse, failed to inform Bachman that Claimant was allowed to request a licensed grader to grade the apple production at his expense;

(5) If so, was that failure a breach of the insurance contract terms;

(6) Whether Pro Ag, acting through Dustin Converse, directed Gregg Bachman to pack out his apple crop;

(7) If so, did that constitute a breach of the insurance contract terms;

(8) Was Pro Ag required under the CCIP and ACIP to include Bachman's apples sold as US Fancy or better as production to count in determining Claimant's indemnity;

(9) Once Claimant's apples were harvested and some sold, was Bachman entitled under the CCIP and/or the ACIP to a complete indemnity based solely on the appraisals without an offset for apples sold as US Fancy or better?

In the event of damages to an apple crop which may constitute a covered loss, a grower has four options: (1) leave the fruit on the trees, an extraordinarily rare step; (2) harvest (i.e. pick) the fruit and sell it for juice (E.g., cider) or processing; (3) harvest and sell the fruit to retailers. I.e., "pack out" the entire crop; or (4) some combination of (2) and (3). Claimant made it very clear via Gregg Bachman's testimony, supported by the testimony of his agent Scott Colville, that # (1) was never an option. In fact, Gregg Bachman testified in his deposition that Claimant always harvested their apples, but they didn't always pack them out. (G. Bachman dep. pp. 38-39.) Harvesting apples was Claimant's standard procedure each year and it is clear that Bachman intended to do so before and after the fateful conversation with Dustin Converse on July 25, 2017.

Claimant asserted in its arbitration brief that the CCIP, the ACIP and the FFQE "incorporate" the LASH and the LAM (Claimant's Arbitration Brief, *supra*, p.2.), but to the extent that Bachman asserts that those are part of the contract terms and binding upon both parties Claimant is incorrect. Although the preamble to the Basic Provisions states "[FCIC] will use the procedures (**handbooks**, manuals, memoranda and bulletins) as issued…in the administration of this policy, including the adjustment of any loss or claim submitted hereunder…," none of those policy provisions adopt or incorporate such handbooks or materials as a contract term. (C-1, p.1.; emphasis added.) On the contrary, both the LASH and the LAM comprise guidelines and rules published by the RMA for FCIC employees and adjusters to follow in administering and adjusting claims. (See e.g., R-3, 5th page. 1. A.)

Claimant's own expert testified that "the handbooks (I.e., LASH & LAM) are more of a step-by-step instruction for the adjuster on what their responsibilities are versus something that may be in the policy." (Hearing testimony of S. Colville, p. 68.) This point was also clarified by Respondent's expert, Desiree King, whose job it is to annually review and interpret policies and procedures. She testified unequivocally the LASH and LAM are "[not] part of the policy."(D. King hearing testimony, 2/05/2020, p. 11.)

Claimant appeared to conflate the term "harvest" with "pack out," arguing that Converse directed Bachman to harvest the 2017 crop. (Hearing transcript, 2/04/2020, pp. 10-11; Claimant's Arbitration Brief, pp.3-4). Claimant is correct that the LAM directs that adjusters "[d]o not advise the insured whether or not to harvest the crop." (C-3, 160, A. (5).) However, no witness, nor any document introduced in this

arbitration matter, supported the claim that Converse actually directed Claimant to harvest the Sunny Hill crop. In fact, Bachman's nephew Jordan testified unequivocally that he overheard all of the conversation and Converse did not say that Bachman had to harvest the crop. (Hearing testimony of Jordan Bachman, 2/04/2020, p.131.) Moreover, the term "Harvest" is defined in the ACIP as "[t]he picking of mature apples from the trees or collecting of mature apples from the ground." (R-2, p. 1; see also Scott Colville hearing testimony, 2/04/2020, p. 83.)

Claimant also argued that Converse failed to advise Bachman of his option to request a state or federal grader to come in and grade the crop. (Hearing Transcript, 2/04/2020, pp. 21-22.) Claimant is again correct that the LAM does direct adjusters that "[w]hen…the insured disagrees with the adjuster-determined grades… [t]he adjuster shall [t]ell the insured that he/she…is allowed to request a… Grader…" (C-4, section 22. E., p. 11.) Scott Colville testified that he believed the failure to give the advice required under the LAM would be a breach of the insurance contract (Hearing testimony of S. Colville 2/04/2020, pp. 41-42), but he did not cite any insurance contract provisions requiring that advice, only referring to the LAM itself.

As stated above, the LAM is not a part of the insurance contract, and any failure to comply with its provisions would not constitute a breach of contract. The same would be true of any alleged failure by Pro Ag's adjuster to comply with any provision of the LAM. Consequently, even if Converse had directed the insured to harvest and/or failed to advise him about grader availability, it would only have been a breach of RMA policy, and not a breach of Claimant's insurance contract. Mr. Colville admitted he is not a lawyer and is simply mistaken in his opinion that a failure to follow the LAM constitutes a breach of the insurance contract.

Turning to Claimant's allegation that Converse directed Bachman to pack out, it is instructive to examine exactly what each of those present said under oath. When asked what Converse had said to him, Gregg Bachman replied that "Dustin said, we can't finalize your claim until it's packed out."(Hearing testimony, p. 108.) Jordan Bachman testified that "you could put it in different words, but [Converse said he was] not going to use the [appraisal] sheets in front of us, [he was] going to use [Bachman's] pack-out records." (J. Bachman hearing testimony, pp 128-32.) When asked whether he ever said to Bachman "you have to pack out your apples, Converse testified "I don't believe so." (Hearing testimony, p. 211.) He indicated to Bachman that, if he was "going to **harvest** [his] apples, [Pro Ag] would have to have records of where they went."(*Id*., p. 213; emphasis added.) Not one of these three witnesses said that Converse directed, instructed or ordered Gregg Bachman to pack out. In fact, Claimant's own agent told Karen

Landman that Gregg's impression that he had to harvest and pack out was "probably a miscommunication." (R-21, p. 2.)

Regarding the use, or not, of the appraisals, Converse said that he couldn't complete them on the first visit due to lack of information, that he explained this to Gregg, went over the appraisal sheets and the grading chart with him, and said he would have to return to complete the appraisals. (Hearing testimony, pp. 149-150, *et seq.*) He recalled Bachman asking for final numbers on loss, which he was unable to provide, his talking about the cost and that he would be picking in a couple of weeks. (*Id.*, p.151.) Bachman himself said that he "inferred" the appraisals would not be used to determine the claim because Converse said the pack out records would be.  (G. Bachman hearing testimony, p. 100.) When asked if he told Bachman the appraisals would not be used, Converse denied that, and said he believed Gregg had misunderstood what he'd said. (Converse hearing testimony, pp. 174-75.) Dustin's superior, Karen Landman, insisted that Pro Ag adjusters do not direct insureds to pack out. (Id., p.235.) In trying to reconcile these accounts, the most reasonable inference is that, whether or not Converse said the appraisals would not be used, he did not instruct Gregg Bachman that he had to pack out. Bachman deduced that from the conversation.

In summary, Claimant's position is that Pro Ag should have adjusted the loss on July 25, 2017, based exclusively on appraisal estimates, paid Bachman for a total loss applying the LASH Adjustment Percentages (C-4, p. 56.), and that there should have been no reduction for apples subsequently sold as US Fancy or better. Ignoring for the moment the fact that would violate the policy requirements, there is no policy provision, nor any legal authority, permitting such a departure from the parties' contract. In attempting to justify its position, Claimant argues that Pro Ag was applying a "new" procedure for the first time in 2017, which was a different approach from what had been done in the past. In retrospect, Claimant insists it would not have packed out had he known that harvesting for juice was an option. Claimant's view is that reasonable farmers make sound management decisions and, being a reasonable farmer, if Claimant had known at the beginning what was learned after the claim was finally adjusted, Bachman would have decided to juice the entire Sunny Hill crop apples at the time of the preliminary appraisal.

An important consideration is the fact that Claimant had not experienced a loss for which they made a claim since 2009-10, if not earlier. (G. Bachman dep., pp.12-13.) Consequently, Bachman's last claim preceded the current version of the ACIP. Whether the earlier insurance contract had different provisions or some adjusters had employed different adjusting practices in the past is irrelevant.  Gregg Bachman knew or should have known that juicing was a viable option, or at least inquired about that alternative, but he based his expectations of the indemnity payment on his experiences many years past.

(Hearing testimony, p. 111.) This would explain his apparently strong disagreement with the preliminary damage estimates, which would be included in Part IV of the AAW, notably entitled "Appraised Production to Count Calculations."  (C-6, pp. 1-3.)  Gregg said that, when Converse asked him to sign the AAW's, he complained that he numbers at the bottom, which is where the actual damage estimates are entered, weren't high enough. (Hearing testimony, pp. 98-99; dep., p.21.)

Claimant had typically decided in the past to pack out borderline loss cases (*Id.*, p.125.), and the only claim Gregg recalled when they sent the apples to juice was the 100 % loss experienced during or before 2009-10. Otherwise, they packed out all of the apples every time. They did so because they thought they would get more money than it would cost to go through the pack out process. In the past, i.e., before 2010, they would submit a claim, collect the indemnity quickly and still sell the fruit. (*Id.*, pp. 117, 125-26.) In other words, they would receive an indemnity for a loss based upon a preliminary damage appraisal estimate, and then later sell much of the crop as US Fancy and keep the proceeds. Indeed, that is exactly what Bachman believed would happen with the 2017 claim. (*Id.*, pp.110-111.)

 According to Gregg Bachman, "any management decision—with the fresh fruit option in our policy--if we would have had actual damage of over 50 or 55 percent--[the apples] would have gone to juice…you know…you're not going to be profitable…you know you're not going to make any money…" (Hearing testimony, supra, pp.104-105.) He said that "with just some basic information about the amount of indemnity approximately, the amount of the damage, [he] would have been able to make the decision to juice those apples rather than pack out." (*Id.*, p.105.) Converse said, however, that he ran some rough numbers on the sliding scale of the grading chart and explained to Gregg how it worked. (*Id*, pp. 149-51; see also, C-4, p. 56.) He said he went over the appraisals with Gregg and some of the potential losses went as high as 60 to 90%.  (Hearing testimony, supra, pp. 150, 201, 205-206

Bachman did not deny that Converse mentioned possible losses upwards of 60%. If Converse did point out that the losses could exceed 60%, the decision to pack out would have been inconsistent with Bachman's management profile that damages over 50 or 55% would dictate sending the crop to juice. Certainly he would have had "enough basic information" to decide whether to opt for that. On the other hand, if those figures were not discussed, then whatever numbers Bachman was complaining about when he looked at the initial AWW's must have suggested a much smaller loss than he himself had forecast when he first inspected the damage. In the final analysis, the most reasonable inference is that Mr. Bachman simply inferred that he had to pack out, assumed that the indemnity would be calculated as he recalled it had been before 2010, and expected that he would get a check without a deduction for apples sold as US Fancy or better. As he later learned, unfortunately he was wrong.  .

ARBITRATION

Regardless of whatever preliminary numbers Converse had listed on the AAW's, by his own inspection Claimant had sufficient information before the meeting on July 25, to conclude that the damages to the crop would likely be substantial. At a minimum, for a farmer who had not had a claim for at least seven years, and possibly longer, reasonable management would dictate that he would at least review his policy, if not consult with his agent.  Curiously, Gregg had never even seen his policy before 2017. (Id., p.111.) He did not push Converse about options, did not even ask about sending the crop to juice or Processing, did not contact anyone else at Pro Ag, nor even call his agent, in order to make a more informed decision.  Claimant now asks that Pro Ag be blamed for his failure to pursue what would have been simple and reasonable management steps to discern his financial options.

Claimant's agent and proffered expert, Scott Colville, testified about the history of the adjustment of claims prior to 2017. He described that adjustments had been made incorrectly in the past allowing farmers to "double dip," and Bachman, "or any other farmer...could have been paid based on the appraisal and turned around and sold the apples and got paid for those as well."  (Hearing testimony, supra, pp. 70-71.) A FAD was issued in 2016, clarifying that any fresh apple production sold as US Fancy or better must be included in production to count and adjusters are to use records of sold production to determine the claim. (FAD-272, R-8; see also ACIP 14 (b) (5) (v), R- 2, p. 5; and see R-3, pp. 18-18.1, section 41. D. (5).) Colville admitted that, although he believed it wasn't in effect until 2017, the FAD reiterated what was already a provision in Bachman's insurance contract, and had been since 2010. (Hearing testimony, pp.71-74) Karen Landman disagreed that a new adjustment procedure was in effect for 2017, saying instead that the FAD was issued "to make sure all AIP's were reading or interpreting the policy the correct way." (*Id*., p.233.)

As it turns out, regardless of when they started, in 2017 Pro Ag was adjusting the Bachman's claim exactly as required by Claimant's insurance policy, and would have been in violation of the contract terms, FA-272 and the LASH, if it had not. It is well established that AIP's and insureds alike are bound by the policy terms and FAD's issued by the RMA. Respondent cited numerous federal court opinions, which will not be repeated here, to the effect that an insured is deemed to have knowledge of all terms and conditions of its insurance policy and they are binding regardless of actual knowledge or hardship resulting from innocent ignorance. (Respondent's Pre-Hearing Brief, 12/05/2019, pp. 6-9; incorporated herein by reference.) The critical provision requiring that any apples sold as US Fancy or better must be included as production to count was contained in both the ACIP, issued in 2010, and FAD-272, issued in 2016, and was applicable to the Bachman claim submitted in 2017. Those were available to Claimant, and its agent was aware of those provisions and could have instructed Mr. Bachman about his options had he only been

consulted. Ultimately, Pro Ag used Bachman's actual sales records, together with the appraisals, to finalize the claim and determine the indemnity. In fact one of the Production Worksheets was based upon the appraisal records. (Converse hearing testimony, supra, pp. 157-161.)

On the final day of hearing, Scott Colville was called as a rebuttal witness and testified that he had the night before retrieved three of his clients' claims files from 2014, 2015 and 2016, respectively, each of which involved damage claims under a fresh fruit option. He said that in each case the claim was paid before the disposition of the apples was known. It was unclear but implied that all three farms were insured by Pro Ag, and in one case Dustin Converse allegedly assisted in the adjustment. Colville said in that case the claim was paid based entirely on the appraisal. No factual details of any of the claims were provided, no documentary evidence was introduced, nor was the identity or location of the claimants or their farms disclosed. (Colville hearing testimony, 2/05/2020, pp. 29-31.)

The testimony of one additional witness has a bearing upon the Pro Ag adjustment procedure for 2017. Joseph Burnham is an independent apple farmer doing business in Ohio, and was one of two such witnesses named by Claimant and deposed prior to the hearing. The testimony of the other witness, Sara Shanteau, was not offered at the hearing, but Mr. Burnham gave hearing testimony by phone. Each of their farms had been insured by Pro Ag for many years and Scott Colville had been their agent. Mr. Burnham had in the past, and again in 2017, experienced damages to his apple crops and filed claims requiring adjustment by Pro AG. He testified that Pro Ag had "for quite a few years" used his pack out records to adjust claims made under his policy. (J. Burnham hearing testimony, pp. 136-37.) His testimony supports the conclusion that Pro Ag had been, at least in response to Burnham's claims, applying the policy provisions as written for "years."

At most this information suggests that, on at least one occasion during each of the three years prior to 2017, an appraisal was performed contrary to the ACIP and the LASH requirements. Such inconsistencies would explain the necessity for the issuance of RMA's FAD-272, i.e., to assure that all AIP adjusters were adhering to section 14(b) (5) (v). Mr. Colville agreed those were in effect at the time of Claimant's loss, and the policy had not changed. (*Id.*, pp., 49-50.) He suggested that these aberrations occurred on a "consistent basis" leading up to 2017. (*Id.*, p. 32.) His testimony, however, was not probative of the true extent to which Pro Ag, or any other AIP adjusters, were failing to follow the policy terms or the LASH between 2010 and 2017. The fact remains that, regardless of how widespread the practice may have been, since 2010 Claimant's policy required including apples sold as US Fancy or better in production to count, and Pro Ag did so in adjusting the Sunny Hill claim.

ARBITRATION

Dustin Converse did admit, however, that he failed to give the instruction that an independent grader could be requested. (Hearing testimony, p. 208.) That did not amount to a breach of contract claim, but could give rise to a potential claim of equitable estoppel against Pro Ag. As argued vigorously by Respondent, however, an arbitrator is precluded from considering equitable claims. (Respondent's Pre-Hearing Brief, supra, pp. 8-9, 13-14; citations omitted.; and see RMA FAD-282.) Accordingly, the arbitrator in this case has no authority to award damages for such claims as estoppel, detrimental reliance, breach of fiduciary duty, negligence, or even constructive fraud, none of which have been asserted by Claimant herein. (See, e.g., Williamson Farm v. Diversified Crop Insurance Serv., 917 F. 3rd 247 (4th. Cir. 2019.).  In the final analysis, Claimant is not entitled to relief under a breach of contract claim. Such an award would be contrary to the insurance contract terms.

THE UNDERSIGNED ARBITRATOR, having heard and reviewed the proofs and considered the allegations and arguments made on behalf of the Parties, does herby AWARD as follows:

(1)  The claims of the Claimant asserted in this arbitration are denied in their entirety;

(2)  The compensation of the Arbitrator totaling $16,500 shall be borne by the Parties equally;

This Award is in full settlement of all claims submitted to this arbitration. All claims not expressly granted herein are hereby denied.


_____     Dated: March 26, 2020I

Scott S. Brinkmeyer, Arbitrator


I, SCOTT S. BRINKMEYER, do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Award.


_____     Dated: March 26, 2020

Scott S. Brinkmeyer, Arbitrator

12

ARBITRATION

,

ARBITRATION

.